******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARGARITA O. *v.* FERNANDO I.*
(AC 42118)

Lavine, Alvord and Elgo, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court granting the application for relief from abuse filed by the plaintiff, his former wife, pursuant to statute (§ 46b-15), and issuing a restraining order against him. The trial court also issued an additional order of protection that required the defendant to stay 100 yards away from the plaintiff, except "when both children are present." *Held*:

1. The trial court did not abuse its discretion in granting the plaintiff's application for relief from abuse and issuing a restraining order against the defendant, as there was sufficient evidence to support a finding that the defendant had subjected the plaintiff to a pattern of threatening; in light of the lengthy, repetitive and hostile nature of the defendant's communications with the plaintiff, which included three e-mails and two text messages, and the trial court's ability to supplement the written exhibits with its observation of the demeanor of the parties at the hearing on the application, that court reasonably could have concluded that the defendant's written threatening communications constituted a pattern of threatening.

2. The trial court's additional order of protection requiring the defendant to stay 100 yards away from the plaintiff except "when both children are present" was clearly erroneous; the order was ambiguous and there was no evidence in the record to support it, as the record revealed that the plaintiff did not request that the restraining order extend to the parties' children, she did not testify at the hearing that she felt as though she was in physical danger except in the presence of both children, and when the court explained that the order did not apply to certain circumstances with "the minor child or when you are also in the presence of the minor child," with no mention of an additional child being present, the plaintiff did not object or express any concern.

Argued January 22—officially released April 23, 2019

*Procedural History*

Application for relief from abuse, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Truglia, J.*, granted the application and issued a restraining order and a certain additional order of protection, and the defendant appealed to this court. *Reversed in part; further proceedings*.

*Fernando I.*, self-represented, the appellant (defendant).

*Kevin F. Collins*, for the appellee (plaintiff).

*Opinion*

ALVORD, J. The self-represented defendant, Fernando I., appeals from the judgment of the trial court granting the application of the plaintiff, Margarita O., for relief from abuse and issuing a restraining order pursuant to General Statutes § 46b-15. The defendant claims that the court erroneously (1) determined that he had subjected the plaintiff to a recent pattern of threatening, and (2) ordered the defendant to stay 100 yards away from the plaintiff except "when both children are present."[1] We conclude that there was no evidence to support the court's order requiring the defendant to "stay 100 yards away from the [plaintiff]" with an exception "for the 100 yard stay away when both children are present." Accordingly, we reverse in part the judgment of the court as to the "stay 100 yards away" order and remand the case for a new hearing with respect to any order of protection, if proven necessary by the plaintiff, in situations where the defendant seeks interaction with his children and the plaintiff is present. We otherwise affirm the judgment of the trial court.

The following facts and procedural history are relevant to our analysis of the defendant's claims. On August 29, 2018, the plaintiff, in a self-represented capacity, filed an ex parte application for relief from abuse, seeking immediate relief against her former spouse, the defendant.[2] In her application, the plaintiff averred under oath that the defendant had "consistently sent [her] very distressing communications for the past years but in the last few months and weeks (particularly the last [forty-eight] hours) his aggressive electronic communication has been mounting to the point that [she was] very concerned about [her] physical safety." In addition, the plaintiff stated that "[she is] a single woman, [she] work[s] in [New York City] and many nights [she] come[s] back late from work and feel[s] that [she is] exposed [to] potential harm from [the defendant]" and that "[t]he [defendant] has his residence in [New York City] but spends almost every day in Greenwich," which is the town where she resides. The court, *Sommer, J.*, denied the plaintiff's application and scheduled a hearing for September 12, 2018, in accordance with § 46b-15 (b).

The parties appeared for the hearing before the court, *Truglia, J.*, on September 12, 2018. At the hearing, the court heard testimony from both parties.[3] The plaintiff testified in relevant part: "[The defendant] keeps on blaming me for everything that is going on in his life; whether he loses a job, whether he cannot get a job, his life has been destroyed by me. And the reason I'm asking for this order now is because he's more agitated. I think the situation has deteriorated for him quite a bit. He doesn't have a job. He doesn't have any money. Still he blames me for everything that is happening to

[him]. . . . In the course of [thirty-six] or [forty-eight] hours, I received three different communications, very disturbing, from him in which some of them he clearly said, you know, like there are implied threats in those communications." The plaintiff also testified that, nine years earlier, the defendant had been arrested twice, "[once] for domestic abuse and [once] for death threats . . . ."[4] The defendant did not dispute the fact of the arrests. The plaintiff explained that she requested relief under § 46b-15 on the basis of a pattern of threatening by the defendant and stated that she believed that she was in physical danger.

The defendant testified in relevant part: "I've been [in the Superior Court] [ten] years, and I lost everything in my life here. . . . [B]ut the good part of it is that her claims were considered false, insufficient, unsubstantiated and rejected by the civil court in the divorce trial, by the criminal court twice, by the Department of Children and Families from the state of Connecticut. I was accused of abuse against my own children. So, I was accused of being mentally insane. I had to undergo ten evaluations with independent psychiatrists and psychologists. One was appointed by the court. They all expressed on the record that I'm not a violent man. I never had any history of violence in my life. . . . Furthermore, it was proven . . . and I have all the records. Unfortunately it's [ten] years and maybe a snippet could be portrayed as something lethal, but is, again, false. . . . [T]he plaintiff has a history of deceit, fraud, entrapment, [and] provocations that it goes for years."[5]

In addition to the foregoing testimony, the plaintiff submitted several exhibits, including copies of text messages and e-mails that the defendant had sent her. The text messages and one of the e-mails had been written in Spanish. The plaintiff, therefore, in addition to providing copies of the original communications, submitted as an exhibit during the hearing a certified translation of these communications.

First, on March 29, 2018, the defendant had sent the plaintiff an e-mail, written in English, which stated in relevant part: "I had your associates in [G]reenwich all over me, from firefighters, police officers, public employees . . . . So I refrained myself from confronting the scene, the last thing I wanted was to make a different sort of scene in front of our kids' doctor . . . . But [I'm] telling you for you to think before you and your attorney speak, what our kids should have experienced and must experience is their parents together, in front of them, telling them the very same message, absolutely in sync, with love, clarity and support, and this has not happened because of you, and it's still not happening because of you. You have prevented this from happening for almost [ten] years, against the law, common sense and their [well-being]. . . . And the reason for that to be the case, as I see it, it's that you

don't understand that our relationship only exists due to them, as a result of them, because of them. If they were not in this world, after what you've done in my life until now, I wouldn't even know anything about you, whether you exist or not . . . your conduct is irresolute, without changing tracks in anything, without firing the unethical lawyer only you decided to retain, without giving back to me, reimbursing me, what you must in the name of decency and justice . . . . You don't get it. This is inconceivable to me, the fact you don't even understand what sort of man I am. You do what I tell you, and you have a positive response from me. Period. Why? Because what I tell you is no other thing than what you should have done and should do under the law and what's right in itself. And so happens that it is me saying it. Is there some feminist and related belief against it? Stupidities about control and inconveniences. They can go and dominate themselves . . . we've got [ten] years of this already. There's a law to be obeyed, giving me control over what I must control for being a father (natural law and rights), an outstanding father as you said, and a loving one per the opinion of the court. Yet, one who has lost any and all authority because of you, my parental rights have been curtailed and undermined by you, in detriment of our kids . . . ."

On April 27, 2018, the defendant sent the plaintiff another e-mail. The certified translation reads in relevant part: "On Monday I met with a group of friends to pray, etc., and before I had prayed to God, and I was thinking about what your attorney said: 'you lose . . .', after accusing me of being a Nazi, crazy and an abuser . . . . I have God, and the fact that you have cheated me, robbed me, and swindled me in that way and with that type of people, as well as everything that that brought with it in my life for many years already, it is what it is.

"The fact that you have destroyed my life by accusing me of being an abuser and crazy, the inherited good name that your own children bear already stained forever, their father vilified by riffraff of all types, etc., and my own family harmed to an unthinkable extreme . . . . Lack of intelligence and pure evil. . . .

"You lack a minimum conscience to understand that decent people don't do what you did and have been doing, they don't hire attorneys and a certain type of them at that—especially, when it was not necessary, it never was . . . nor do they similarly use the police, firemen, schools and ideologized social structures (in a society fragmented by hate due of concepts of race, social class, origin, religion, and questions of identity) in order to harass and destroy the life of the father of their children. Only someone morally and spiritually sick can do such a thing. It's already been almost ten years of this craziness, exclusively carried on by you, even though several groups have done their part due

to their respective motivations. You have decided not to change your course, staying firm in the error, the ignominy and the cheating . . . and as if this were not enough, counter to your legal representations and commitments.

"The only thing I asked for from the beginning was co-parenting, even after you refused to buy my part of the house and consent to that, and it is specifically what you have refused even until today. And we have all lost so much, but especially on the human level our children, who have not seen their parents greet each other and interact civilly in almost ten years already due to your own decision . . . all their infancy, to the point that it no longer has relevance . . . while at times, for moments and reciprocally you became tired of stupidities like little smiles and that sort of thing in churches and public sites . . . something frankly lunatic. You robbed your children of the opportunity to grow up with two parents, separated but acting civilly toward each other, as ordered by the law according to your own legal representatives.

"What were you expecting? Smiles, welcoming and nothing happened here . . . the subject for me has always been our children, not my relationship with you after everything I lived through. And I find it incomprehensible that you don't understand it. My entire investment of love, time, effort, professional decisions, deprivations of all types and resources provided for our children, you have destroyed. You have robbed and defrauded me. Of course, it is important that such injustices cannot remain unpunished. But the curious thing of everything is that someone could think that they could destroy me and dominate me through my relationship with you, something sincerely demented and an exclusive recipe for tragedy. In this sense, I thanked you and I thank God for the good sense that you have given me.

"It has not been nor is it easy for me, but my greatest success is being happy in spite of this craziness. Contemplating the possibility of my death many years ago, I understood that the only one who loses here, if I allow this to affect me, is me and those who love me. This would be losing and allowing the bad things to mortify me. I chose to be happy, and although I am very tired and exhausted (deeply exhausted), I am a happy person. The uncertainness of not knowing where I will live tomorrow, in what country, not having a relationship with my daughters and not living with my children as much as I would wish . . . losing contact with them over time . . . having doubts, or if I'm out of work and a roof to live or die under, I don't lose sleep. In one way or another, justice will come, in this life or in the next one. Contemplating eternity, our temporary stay here on earth is ephemeral . . . and we are almost [fifty] years old. Statistically speaking we have less time

left than we have lived. . . .

"On the other hand, for the professional that I am, beyond the destruction of my career. And in your case, you only decided to be it seriously—support through the subject of identity policies, which makes me happy for my children—after destroying my life, professional and in general, not when we were married and the family needed it more than ever. You didn't do more than complain that you had to work part-time, and weren't worth anything at home or as a mother. . . . Finally, a very serious mistake, for which I have paid with interest in this world. And what have you gained? Destroying the father of your children, robbing him, and a job that you hate. Not even a mentally retarded person acts that way. As I said, injustices will be paid for. And I hope that you can do it for yourself in time, because otherwise your debt will be eternal before God."

On August 28, 2018, the defendant sent the plaintiff a series of text messages. With respect to the first message, the certified translation reads in relevant part: "Sometimes I wonder how it is possible that a person goes up to receive the Host after what you have been doing and continue doing. For me it's incomprehensible. You have no conscience, that has been the big problem. . . . I don't have a job, I have to assume debts to live (if I can) and probably I have to do with nothing after your thefts, fraud, social, judicial, and litigious persecutions—litigations that I will continue until justice is done, until I die if necessary. On the other hand, if you knew the garbage that I have had to live with of harassment and the like by the groups connected to your riffraff lawyer, whom I told you that you have to get rid of in order to do things right, so even someone like you would be surprised. You must think that that short time is all it takes, that time heals and stupidities like that. It's been almost [ten] years, since I made you a roadmap of what you would have to do or not do justly, what is right and is correct among good people. That is the only thing that matters. And now the only thing that helps is to return to me what is mine with interest, that you make right all the harm you have done in the proper way, and return to me my relationship with my daughters, in addition to being sorry and asking for forgiveness. You, as you have wrongly taught our daughters, do not know how to ask for forgiveness, something transcendental in life to be a good person, which also means amending the harm caused. I cannot get over my astonishment on seeing you walk to the altar and receive the body of Christ. And you have been doing it for over [ten] years. For me it's something incredible."

In a subsequent text message, the defendant stated in relevant part: "If you don't intend to do what's right, we'll continue in the courts—in one way or another,

for my children, I will have justice. And if I have to go, I won't hesitate, I'll go. . . . It seems to me that you and those who advise you don't manage to understand the type of man with which you are dealing with and the consequences of what has been done here."

That same day, the defendant also sent the plaintiff an e-mail, which stated in relevant part: "Despite the fact I am currently forced to leave the country (as things stand right now) because of you and your lawyer, since I have no employment and savings (only debts, after living paycheck to paycheck) as a result of what you've been doing to me for years, it seems surreal to me. Why don't you do coparenting with me, knowing with full certainty that this is the only path and way for us to have any contact whatsoever in life? Instead, you keep violating the law and generating deep frustration and negativity in me. You tell me post facto of the issues that arise in our children due to your lack of coparenting . . . . It's not only that you can't see it, but you don't seem to comprehend the everlasting irreparable damage in our relationship for it, beyond the defamation, slander and libel that completely destroyed my life because of criminal charges and outrageous allegations of all sorts against me before the police/judiciary and elsewhere. You destroyed my life . . . and severely hurt your own children as well. My power, authority and control as a father over my children have always been reasonable and loving, but you have taken them away from me against court orders and due to the misdeeds uncovered before the judiciary. If you wanted for me to hate you, let me tell you that [you] have done all the right things for that to be the case. Time does not heal anything, it only aggravates things. You need to do what's right. But you don't hear what I say, much less understand the impact of what you do."

At the conclusion of the hearing, the court orally rendered its decision.[6] The court told the defendant: "Sir, I am very sympathetic to your situation. I can see that things have been very difficult. It's been a long, high conflict divorce situation." The court stated that the plaintiff had "carried her burden of proof that she has been subjected to a recent pattern of threats. I think some of the language here does imply . . . does carry implied threats that could be unsettling." When the defendant asked which statement was considered a threat, the court explained: "Plaintiff's Exhibit 2; as I said, injustices will be paid for. Destroying . . . and what you have gained? Destroying the father of your children, robbing [him], and a job that you hate. Not even a mentally retarded person acts that way. As I said, injustices will be paid for."[7] Thereafter, the court explained the various limitations[8] on the rights and privileges of the defendant that were part of its restraining order, which, by its terms, expires on September 12, 2019. In addition, the court ordered the defendant to stay 100 yards away from the plaintiff, except when

"both children are present." This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court erroneously determined that he had subjected the plaintiff to a pattern of threatening. Specifically, he argues that the court erroneously "deemed one single out of context opinion, unsettling or not per third-party views, as an implied threat," and "found no valid allegation of physical abuse, stalking and/or a direct threat of any kind as a result of the plaintiff's spurious application for relief from abuse. Therefore, there is no possibility of arguing a pattern of threats under applicable law." We disagree.

We begin by setting forth the standard of review and legal principles that guide our analysis of the defendant's claim. "[T]he standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented." (Footnote omitted; internal quotation marks omitted.) *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 111–12, 89 A.3d 896 (2014). "It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Powell-Ferri* v. *Ferri*, 326 Conn. 457, 464, 165 A.3d 1124 (2017).

"In pursuit of its fact-finding function, [i]t is within the province of the trial court . . . to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *Brown* v. *Brown*, 132 Conn. App. 30, 40, 31 A.3d 55 (2011). "Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Our deferential standard of review, however, does not extend to the court's interpretation

of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal." (Citation omitted; internal quotation marks omitted.) *Princess Q. H.* v. *Robert H.*, supra, 150 Conn. App. 112.

Section 46b-15 (a), which governs this case, provides in relevant part: "Any family or household member as defined in section 46b-38a,[9] who has been subjected to . . . a pattern of threatening, including, but not limited to, a pattern of threatening, as described in section 53a-62, by another family or household member may make an application to the Superior Court for relief under this section. . . ." (Footnote added.)

To the extent that the defendant argues that the court erred because its conclusion was based on a *single* statement, namely, his statement that "injustices will be paid for," we are unpersuaded. Although the court responded to the defendant's question with just one example from the evidence in support of its conclusion,[10] the court had before it several written threatening communications that the defendant had sent to the plaintiff, including three e-mails and two text messages.

The defendant also argues that his statements were taken "out of context" and that he had been referring to justice within the legal system and within the context of his religious beliefs. Specifically, he argues that he was "manifesting his longing for justice within the legal system for himself and his children."[11] In addition, he argues that he was referring to "[his] belief in eternal justice, as long as such e-mail was sent after a weekly Christian gathering of men where each of the participants provides his life testimony, and all pray together for themselves and their families in the context of eternal life and justice before the Creator."

We repeat the well established linchpin of our role on appeal: "[W]e do not retry the facts or evaluate the credibility of witnesses." (Internal quotation marks omitted.) *Krystyna W.* v. *Janusz W.*, 127 Conn. App. 586, 591, 14 A.3d 483 (2011). Moreover, as our Supreme Court has repeatedly noted, "trial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant." (Internal quotation marks omitted.) *Brody* v. *Brody*, 315 Conn. 300, 306, 105 A.3d 887 (2015); see also *Princess Q. H.* v. *Robert H.*, supra, 150 Conn App. 116.

In *Princess Q. H.* v. *Robert H.*, supra, 150 Conn. App. 116, this court viewed the trial court's decision in light of the surrounding circumstances and context of all the evidence presented to the trial court. This court determined that the plaintiff was entitled to a restraining order pursuant to § 46b-15, on the ground of stalking, when the defendant, her former spouse,

drove past her house two times.[12] Id., 116–17. The trial court in *Princess Q. H.*, like the trial court in the present case, "heard ample evidence about the parties' stormy relationship and the fact that the plaintiff and the defendant were adverse parties in a civil action at the time of [the conduct giving rise to relief pursuant to § 46b-15]."[13] Id., 116.

This court concluded: "In light of the evidence and the surrounding circumstances, we conclude that the court did not abuse its discretion in concluding in the context of all of the evidence presented to it that the defendant's conduct in driving past her home, turning around, and immediately driving past her home a second time constituted an act of stalking. The [trial] court found after consideration of the evidence that shortly before the plaintiff sought relief under § 46b-15, the defendant acted in a manner that constituted stalking as that term is commonly defined and applied. The defendant did not testify as to any contrary explanation for his presence near her home. In light of the foregoing, the court's decision does not contain unsupported findings or reflect a misapplication of the law." Id., 116–17.

In the present case, although the defendant did, in his communications to the plaintiff, refer back to the parties' legal proceedings and his religious beliefs, the defendant also expressed, untethered, his negative feelings, of hatred and anger, toward the plaintiff.[14] Moreover, he repeatedly emphasized, at length, how he felt that the plaintiff had "completely destroyed his life" and was to blame for the hardships he was facing.[15] Thus, in light of the lengthy, repetitive and hostile nature of the defendant's communications, and the trial court's ability to supplement the written exhibits with its observation of the demeanor of the parties at the hearing,[16] the trial court reasonably could have concluded that the defendant's written threatening communications constituted a pattern of threatening.

Because the record establishes that there was sufficient evidence to support a finding that the defendant subjected the plaintiff to a pattern of threatening, we conclude that the court did not abuse its discretion in granting the plaintiff's application for relief from abuse and issuing a restraining order against the defendant.

## II

The defendant also claims that the court erroneously ordered him to stay 100 yards way from the plaintiff except "when both children are present." The defendant, in essence, claims that the effect of the court's order on his desire to have a relationship with his children is to burden unreasonably that relationship in that *both children*[17] have to be present with the plaintiff in order for the exception to apply. Specifically, he argues that "the terms of his restraining order do not allow [him] to attend school events if 'both children' are not

present jointly with the plaintiff, namely: curriculum night—standard for children not to be there, sports and school sponsored events, high school graduation, concerts, church, and others. The only exception to the restraining order applies when 'both children are present'—both U.S. students. It is also unclear whether [he] can pick up one, both or none of his children from their home." In other words, if only one, but not both, of his children are with, or within 100 yards of, the plaintiff, he may not have contact with that child. We conclude that there is nothing in the record to support the court's additional order of protection as modified by the exception requiring the presence of both children.

The record reveals the following additional facts and procedural history. The parties have three children together. At the time that the restraining order was imposed, on September 12, 2018, one of the parties' children attended college in Spain, and two of the children attended high school and lived with the plaintiff. At the hearing, the defendant explained that, although the plaintiff was not requesting that the restraining order extend to the parties' children, a court order to stay 100 yards away from the plaintiff would affect his ability to see his children: "I could not kiss my children if I happened to be in church. I cannot pick up, still, my children from my own house . . . . I cannot attend my son's high school graduation if she's there. I cannot attend the high school barbecue if she's there." The court responded: "I can always make an exception for that." The court, at the conclusion of the hearing, explained its additional orders of protection that it was going to impose as a result of the restraining order: "The [defendant] is to stay at least 100 yards away from [the plaintiff] at all time[s], however an exception is to be made when the parties are in the presence of both children. So, in other words, the order does not apply [for] pickup and drop-off for the minor child or when you are also in the presence of the minor child, say at a family gathering or church or something like that." In its written additional orders of protection, the court provided that the defendant must stay 100 yards away from the plaintiff, except when "both children are present."

As previously stated, "[i]n determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Princess Q. H*. v. *Robert H.*, supra, 150 Conn. App. 111–12.

First, we find ambiguity in the court's additional order of protection. Furthermore, we discern no evidence, set forth in the plaintiff's application or provided at the hearing on September 12, 2018, to support such an order, as modified by the exception requiring the presence of both children. The plaintiff did not request that her restraining order extend to the parties' children. Moreover, she did not testify that she felt as though she was in physical danger except in the presence of "both children." At the hearing, when the court explained that "the order does not apply [for] pickup and drop off for the minor child or when you are also in the presence of the minor child," with no mention of an additional child being present, the plaintiff did not object or express any concern. Accordingly, the court's order requiring the defendant to stay 100 yards away from the plaintiff, and providing an exception only when "both children" are present, has no evidentiary basis.

The judgment is reversed only as to the order requiring the defendant to stay 100 yards away from the plaintiff with an exception when both children are present, and the case is remanded for a new hearing with respect to any order of protection, if proven necessary by the plaintiff, in situations where the defendant seeks interaction with his children and the plaintiff is present. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the applicant or others through whom the applicant's identity may be ascertained. See General Statutes § 54-86e.

[1] The defendant also claims that the trial court "should have exercised judicial restrain[t]" and that the restraining order infringes on his parental rights, his right to freedom of speech, and his right to freedom of religion. We decline to review these claims, however, because they are inadequately briefed. See *Tonghini* v. *Tonghini*, 152 Conn. App. 231, 239, 98 A.3d 93 (2014) ("It is well settled that [w]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." [Internal quotation marks omitted.]).

The defendant additionally claims that the trial court erred by ignoring "the plaintiff's [pattern of] advancing civil claims illegally" and violating his right to due process. Those claims, however, are not supported by the record. See footnotes 3, 5, and 7 of this opinion.

[2] The parties had been divorced since September, 2010. They have three children together, one of whom is a minor.

[3] On appeal, the defendant claims that, with respect to this hearing, the trial court violated his right to due process. Specifically, he argues that (1) "[he] was not allowed to ponder the veracity, accuracy and completeness of the exhibits admitted by the . . . court, which gave no consideration to the context, timing of the allegation, history of the case, fraud, deceit, false allegations, defamation, and falsehoods of all sorts by the plaintiff," (2) "[he] could not submit any evidence to make his case . . . or to question the [plaintiff] under oath," (3) "[j]udgment was rendered from the bench without

proper analysis of [his] timely provided prehearing memorandum," and (4) "[he] was not allowed to review and compare [the plaintiff's] Spanish-English translation . . . and did not even receive copies of the exhibits." The defendant's contentions, however, are not supported by the record.

First, the court specifically asked the defendant whether he had any evidentiary objection to the documents submitted by the plaintiff. The defendant objected on the grounds that the exhibits were selective and that the contents were not relevant. The court responded that the exhibits were relevant and that he would have an opportunity to supplement the copies of the communications provided by the plaintiff. Moreover, the defendant did not, at any point in time, attempt to submit any evidence, nor did he seek to question the plaintiff under oath. The court, therefore, did not deprive him of an opportunity to do so. In addition, with respect to the defendant's prehearing memorandum, the record reflects that the trial court reviewed this document before rendering its decision. Finally, the record reflects that the defendant did receive copies of the exhibits and was afforded the opportunity to view the certified translation. See footnote 7 of this opinion.

[4] The defendant refers to these incidents as "past false allegations," "false criminal charges" and "illegal arrests," and states that he had been arrested for strangulation, or attempted murder, but the charges "never came to fruition after various witnesses interviewed by the police at the time of [his] arrest corroborated that there never was any violence or threats of any sort from [him] toward the plaintiff."

[5] On appeal, the defendant claims that the court erred by ignoring "the plaintiff's [pattern of] advancing civil claims illegally . . . ." There is, however, nothing in the record to support this claim.

At the beginning of the hearing, the defendant provided the court with a copy of his thirty-five page prehearing memorandum, with attached exhibits. The defendant explained that the exhibits included copies of sworn testimony of the parties from previous proceedings and that the memorandum was intended to provide the court with "the full picture of why this is happening right now; what is the timing, the context, and the falsehood behind it." Moreover, at the hearing, the defendant testified, at length, about what he characterizes as the plaintiff's "modus operandi of advancing civil claims through extortion in the way of false criminal charges and overall defamation . . . ."

Nothing in the record supports the defendant's assertion that the court ignored his testimony or failed to consider his prehearing memorandum. See footnote 3 of this opinion. Rather, at the conclusion of the hearing, the court stated that it had "listened very carefully to the testimony of both parties in this case," and "carefully reviewed the prehearing memorandum submitted by the defendant."

[6] The record does not reflect that the trial court created a signed memorandum of decision in compliance with Practice Book § 64-1 (a) or that the defendant took measures to perfect the record in accordance with Practice Book § 64-1 (b). The defective record does not hamper our ability to review the issues presented on appeal because we are able adequately to ascertain the basis of the court's decision from the trial transcript of the court's oral decision. See *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 109 n.2, 89 A.3d 896 (2014).

[7] The defendant challenges the accuracy of the translation with respect to his single statement "injusticias se pagan" which had been translated into English as "injustices will be paid for." The defendant argues, on appeal, that the correct translation is "injustices *are* paid." (Emphasis altered.) He argues that because "there is no future tense in it," it supports his contention that he made the statement in the context of his religious beliefs.

The defendant argues that "[he] was not allowed to review and compare [the plaintiff's] Spanish-English translation . . . and did not even receive copies of the exhibits," which violated his right to due process. The record, however, reflects that, at the hearing, the defendant was given a copy of the certified translation and provided with the opportunity to review the plaintiff's exhibits.

Moreover, to the extent that the defendant argues that he did not receive advance notice of the plaintiff's certified translation, he does not cite any legal authority that entitles him to such notice nor does he explain how the lack of such prehearing notice amounted to a deprivation of due process. Therefore, we decline to review such a claim. See footnote 1 of this opinion.

[8] As the terms and conditions of protection, the court ordered that the defendant must (1) surrender or transfer all firearms and ammunition, (2) not assault, threaten, abuse, harass, follow, interfere with, or stalk [the

plaintiff], and (3) stay away from the home of [the plaintiff] and wherever [the plaintiff] shall reside.

[9] General Statutes § 46b-38a (2) defines a "[f]amily or household member" to include "[s]pouses or former spouses."

[10] As previously stated, the defendant, at the hearing, asked the court which of his statements constituted a threat, at which point the court stated: "Plaintiff's Exhibit 2; as I said, injustices will be paid for. Destroying . . . and what you have gained? Destroying the father of your children, robbing [him], and a job that you hate. Not even a mentally retarded person acts that way. As I said, injustices will be paid for."

[11] At the hearing before the trial court, the defendant testified in relevant part: "[I]n other communications simultaneously at the same time that you don't have, what I said is that I'm looking for justice within the legal system. There is no threat of any nature whatsoever."

[12] The trial court had granted the plaintiff relief based, in part, on a pattern of threatening, but, on appeal, this court did not reach the issue of whether the defendant's conduct constituted a pattern of threatening under § 46b-15.

[13] Specifically, in her application, the plaintiff averred under oath that "the defendant had contacted her on the telephone on several occasions in 2012; that over the past several weeks, she had received prank calls from an unknown caller; that the defendant put his hands around her neck 'at one time'; that, when she was married to the defendant, he once told her that 'he can protect himself if he had to'; and that she was fearful that the defendant would try to hurt her or her daughter." *Princess Q. H.* v. *Robert H.*, supra, 150 Conn. App. 107. The trial court recognized that "[t]his is not a case where [the plaintiff] is telling me about a physical threat, or physical pain or physical injury . . . ." (Internal quotation marks omitted.) Id., 110.

[14] For example, as previously stated, he told the plaintiff: "If you wanted for me to hate you, let me tell you that [you] have done all the right things for that to be the case. Time does not heal anything, it only aggravates things." In addition, he told her that she was "generating deep frustration and negativity in [him.]" He also told the plaintiff that "[her] conduct is irresolute," that she had a "[l]ack of intelligence and [was] pure evil," that "[she] lack[s] a minimum conscience to understand that decent people don't do what [she] did," and implied that she was "morally and spiritually sick."

[15] In addition to stating, several times, that the plaintiff had destroyed his life, the defendant also told the plaintiff that he "had lost any and all authority because of [her]," that she had "cheated [him], robbed [him], and swindled [him]," "defrauded [him]," and had destroyed his career. Moreover, the defendant blamed the plaintiff for his being "forced to leave the country," which he describes, on appeal, as "self-deportation."

At the hearing before the trial court, the defendant's testimony, in a similar fashion, focused on what he viewed to be the plaintiff's "history of deceit, fraud, entrapment, [and] provocations." On appeal, the defendant likewise dedicated a significant portion of his brief to summarizing, what he views to be, the plaintiff's "threats, abuse, deceit, concealment, fraud, and other misdeeds . . . which also include perjury [and] false documentation," as well as the plaintiff's "ulterior motives," and "defamation."

[16] At the hearing, the defendant acknowledged that he may have sounded "frustrated or emotional."

[17] Although the parties have three children together, their oldest daughter attends college in Spain. Accordingly, the court's order, referring to "both children," presumably refers to the two children who live in the United States with the plaintiff.