******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D. S. *v.* R. S.*
(AC 43109)

Bright, Devlin and Harper, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court granting the application for relief from abuse filed by his daughter, the plaintiff, and issuing a domestic violence restraining order against him. The trial court granted the plaintiff's ex parte application for relief from abuse on behalf of herself, her minor child and her mother, and issued a restraining order against the defendant that required him, inter alia, not to harass, follow, interfere with or stalk the plaintiff or her minor child. The court thereafter conducted a hearing on whether to extend the ex parte order, at which the plaintiff testified that the defendant's actions were affecting the child's behavior and schoolwork, and that the child did not want to be around the defendant and was afraid that the defendant was following him. The defendant testified that he went to the area across the street from the child's school bus stop two to three times a week and waved and said hello to the child. The court rendered judgment denying the continuation of the ex parte order as it pertained to the plaintiff and continuing it as to the child. In continuing the ex parte order as to the child, the court stated that, rather than using the dictionary definition of stalking, it would use the statutory (§ 53a-181d) definition set forth in the crime of stalking in the second degree, which defined stalking as to follow, lie in wait for, observe, surveil, communicate with or to send unwanted gifts to a person that results in emotional distress. On appeal, the plaintiff claimed that the trial court used the wrong definition of stalking and that it should have used the definition of stalking in *Princess Q. H.* v. *Robert H.* (150 Conn. App. 105), and erroneously relied on testimony that the plaintiff gave on behalf of the child. *Held*:

1. The trial court did not err in issuing the domestic violence restraining order against the defendant: although the court's reference to the definition in § 53a-181d was incorrect, that narrower definition was not inconsistent with the common understanding of stalking relied on in *Princess Q. H.*, in which the court articulated a broader standard of stalking in the civil protection order context than in the criminal context, and evidence establishing that the defendant's conduct met the criminal standard was more than sufficient to satisfy the civil standard; moreover, the court credited the plaintiff's testimony that the defendant surveilled her and the child and surreptitiously attempted to gather information about the child from the plaintiff and her mother, and the court credited the testimony of the plaintiff and her landlord that the defendant stood across the street from the bus stop to see and to attempt to interact with the child, who did not want the same with the defendant.

2. The defendant's claim that the trial court erroneously relied on testimony that the plaintiff gave on behalf of the child was unreviewable, the defendant having failed to properly preserve his objection at the hearing: although the defendant objected to the plaintiff's testimony about the child's fears, the court overruled the objection, which was not stated precisely, and the defendant made no further objections specific to that claim after he declined the court's invitation to have the child testify; moreover, as there was substantial evidence before the court that established that the child feared the defendant, any error in the court's having overruled the defendant's objection to such testimony was harmless.

Argued March 12—officially released July 14, 2020

*Procedural History*

Application for relief from abuse, brought to the Superior Court in the judicial district of Danbury, where the court, *Hon. Sidney Axelrod*, judge trial referee, granted the application in part and issued a restraining

order, from which the defendant appealed to this court. *Affirmed.*

*Norman J. Voog*, for the appellant (defendant).

*Opinion*

HARPER, J. The defendant, R. S., appeals from the judgment of the trial court granting the application of the self-represented plaintiff, D. S., for relief from abuse and issuing a domestic violence restraining order pursuant to General Statutes § 46b-15.[1] On appeal, the defendant claims that the court incorrectly based its decision on (1) the wrong definition of stalking and (2) testimony of the plaintiff given on behalf of her minor child (child). We affirm the judgment of the trial court.[2]

The record reveals the following relevant facts and procedural history. On May 29, 2019, the plaintiff filed an ex parte application for relief from abuse against the defendant, pursuant to § 46b-15, on behalf of herself, her child, and her mother. The defendant is the plaintiff's father and the former husband of the plaintiff's mother. In her application, the plaintiff averred under oath that the defendant engaged in threatening behavior, stalking, and harassment. Specifically, she alleged that the defendant had continued to try to make contact with the child (1) by showing up at the child's school bus stop, school, summer camp, and Cub Scout meetings, and by watching him from a distance, (2) by trespassing onto the plaintiff's property, and (3) by using the "Find My iPhone"[3] application on the child's iPad in order to locate the plaintiff's new home. The plaintiff further alleged that the child is afraid of the defendant and, more specifically, afraid that the defendant will try to take him away from the plaintiff. According to the plaintiff, the child gets "extremely upset" whenever the defendant arrives at the bus stop, school, and other events, and the child wants no further contact with the defendant. Additionally, the plaintiff alleged that the defendant sent harassing text messages to the plaintiff's mother and sent threatening letters, e-mails, and text messages to the plaintiff.

On May 29, 2019, the court issued an ex parte restraining order that the defendant, among other things, not harass, follow, interfere with, or stalk the plaintiff and her child. The court further ordered that the defendant stay away from the plaintiff's home, that he stay 100 yards away from the plaintiff and her child, and that he stay 100 yards away from the child's bus stop. The court set a hearing date of June 7, 2019, in order to determine whether to extend the order.

At the hearing, both the defendant and the self-represented plaintiff appeared, testified, and submitted evidence on the issue of the plaintiff's application for relief from abuse. During the hearing, the plaintiff's testimony, in large part, mirrored the statements she had made in her application. More specifically, she testified that the child did not want the defendant at his bus stop; the child was always looking over his shoulder, afraid that the defendant was following him; the defen-

dant appeared at the child's new bus stop, despite not having been told previously about the new bus stop location; the child, once at the bus stop, was afraid to exit the car until the bus arrived; the child has told the plaintiff that he does not want to be around the defendant; the defendant showed up uninvited to the child's Cub Scout meeting and was asked to leave because his presence upset the child; the defendant's actions are affecting the child's behavior and school-work; and the defendant, despite the plaintiff's instructions to cease and desist, continued to stand near the bus stop to wave at and speak to the child. The plaintiff also testified that one of her child's friends, during a sleepover at her house, told her that her child was afraid that the defendant was going to take him away and was crying about it. She further testified that her mother told her that, when the plaintiff was not at home, her child would close the shades because he was afraid that the defendant would show up at the house. The plaintiff also testified that since the issuance of the restraining order, the child is the calmest he has ever been but that he still closes the window shades.

The defendant also testified at the hearing. Specifically, he admitted to going to the area across the street from the bus stop, with balloons, two to three times per week. According to the defendant, he waves and says "hello" as the child enters and exits the bus. The defendant further testified that he stands out in the open as he waits for and waves at the child, and some-times parks his car and stands on the property of a neighbor, with the neighbor's permission.

Gail Howard, the plaintiff's landlord, also testified at the hearing. According to Howard, the defendant waits at the bottom of the driveway for the child to get off the bus. She further testified that when the child sees the defendant, the child does not smile and he "behav[es] in a tense fashion." Howard also testified that she has seen the child "rush away from the defendant."

The plaintiff also entered into evidence several exhibits, including a series of text messages from the defendant to the plaintiff's mother, exhibit 1, and a report she filed with the Redding Police Department, exhibit 4. The text messages show the defendant's efforts to gain information surreptitiously from the plaintiff's mother about the child's travels to school. Additionally, the text messages show that the defendant gave the plaintiff's mother $1400 for that information. The report filed by the plaintiff sets forth that the child does not want to see the defendant, that the child refuses to acknowledge the defendant, and that the defendant's conduct "ha[s] become emotionally draining and dam-aging to my child."

At the conclusion of the evidence, the court bifur-cated final arguments and its decision regarding the

extension of the restraining order into two parts: the application of the order as it applied to the plaintiff, and the order as it applied to the child. After the court heard argument with regard to the restraining order as it applied to the plaintiff, the court denied the continuation of the order as it applied to her. Prior to hearing argument about the restraining order as it applied to the child, the court stated that it was not using the dictionary definition of stalking but, rather, the statutory definition set forth in General Statutes § 53a-181d, which defines the crime of stalking in the second degree.[4] Specifically, the court stated that stalking means "follows, lies in wait for, observes, surveils, communicates with or sends unwanted gifts to a person that results in suffering emotional distress."

The court then heard argument with regard to the restraining order as it applied to the child. At the conclusion of oral argument, the court stated: "I'm continuing the order insofar as it relates to the minor child on the grounds that there's been stalking as a result of the course of conduct by the defendant in which two or more times he has laid in wait for, observed or surveilled, or sent unwanted gifts, and [that] has resulted in emotional distress to the child. . . . [O]ne, [the defendant is] to stay 100 yards away from the bus stop of the minor child; two, he's to stay 100 yards away from the minor child; three, he's not to stalk the minor child." This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the trial court erred when it issued a domestic violence restraining order pursuant to the definition of stalking provided in § 53a-181d and not the definition provided by this court in *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 115, 89 A.3d 896 (2014). We agree that the court relied on the statutory definition of stalking rather than the common meaning of the word; however, following our careful review of the record, we cannot conclude that the court erred in concluding that the defendant engaged in stalking as to the child.

We first set forth the well settled standard of review in family matters, along with other relevant legal principles. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there

is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Our deferential standard of review, however, does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal." (Citation omitted; internal quotation marks omitted.) Id., 111–12.

Additionally, as we often have noted, "[w]e do not retry the facts or evaluate the credibility of witnesses." (Internal quotation marks omitted.) *Margarita O.* v. *Fernando I.*, 189 Conn. App. 448, 463, 207 A.3d 548, cert. denied, 331 Conn. 930, 207 A.3d 1051, cert. denied,      U.S.      , 140 S. Ct. 72, 205 L. Ed. 2d 130 (2019). Rather, "[i]n pursuit of its fact-finding function, [i]t is within the province of the trial court . . . to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *Kathrynne S.* v. *Swetz*, 191 Conn. App. 850, 857, 216 A.3d 858 (2019).

Furthermore, given the nature of this appeal, it is important to underscore that "[w]e have long held that this court may affirm a trial court's proper decision, although it may have been founded on a wrong reason." (Internal quotation marks omitted.) *Geremia* v. *Geremia*, 159 Conn. App. 751, 779, 125 A.3d 549 (2015); see also *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 151, 709 A.2d 1075 (1998) (appellate court not required to reverse trial court ruling that reached correct result but for wrong reason), overruled in part on other grounds by *Ulbrich* v. *Groth*, 310 Conn. 375, 412 n.32, 78 A.3d 76 (2013).

Stalking is not defined in § 46b-15. In *Princess Q. H.* v. *Robert H.*, supra, 150 Conn. App. 105, this court analyzed § 46b-15 (a). This court reasoned: "The legislature did not provide a definition of stalking as that word is used in § 46b-15 (a). Although it could have done so, it did not incorporate by reference the definitions of stalking that are contained in the Penal Code, specifically, § 53a-181d . . . ." (Footnotes omitted; internal quotation marks omitted.) Id., 114–15. This court further stated that "[w]e interpret the statute in accordance with these commonly accepted definitions, satisfied that the plain meaning of the statute does not yield an unworkable or absurd result. We reject . . . reliance on the narrower definitions of stalking codified in our

Penal Code. In so doing, we are mindful that our legislature reasonably may have chosen to rely on a narrower definition of stalking in delineating criminal liability, while deciding that a broader definition of stalking was appropriate in the dissimilar context of affording immediate relief to victims under § 46b-15." Id., 115. As a result, this court looked to and provided the commonly approved usage of the word and defined stalking as follows: "[T]he act or an instance of following another by stealth. . . . The offense of following or loitering near another, often surreptitiously, to annoy or harass that person or to commit a further crime such as assault or battery. Black's Law Dictionary (9th Ed. 2009). To loiter means to remain in an area for no obvious reason. Merriam-Webster's Collegiate Dictionary (11th Ed. 2011)." (Internal quotation marks omitted.) *Princess Q. H.* v. *Robert H.*, supra, 115.

Employing the aforementioned legal principles along with the definition of stalking as it is commonly defined and applied, this court held, in *Princess Q. H.*, that the trial court did not abuse its discretion when it concluded "that the defendant's conduct in driving past [the plaintiff's] home, turning around, and immediately driving past [the plaintiff's] home a second time constituted an act of stalking." Id., 116. With *Princess Q. H.* and our standard of review in mind, we now turn to the defendant's claim.

At the § 46b-15 hearing in the present case, the court stated that it would use the definition of stalking set forth in § 53a-181d. In its oral decision, the court found, consistent with the plaintiff's testimony, that the defendant "two or more times . . . has laid in wait for, observed or surveilled, or sent unwanted gifts, and [that] has resulted in emotional distress to the child."

Consistent with this court's decision in *Princess Q. H.*, we note that the trial court's reference to the statutory definition of stalking was incorrect. The narrower statutory definition set forth in § 53a-181d, however, is not inconsistent with the common understanding of stalking relied on by this court in *Princess Q. H.* We further note that, in *Princess Q. H.*, this court intentionally articulated a broader standard of stalking in the civil protection order context than the one employed in the criminal context. See *Princess Q. H.* v. *Robert H.*, supra, 150 Conn. App. 115. Accordingly, evidence establishing that the defendant's conduct met the criminal standard of stalking is more than sufficient to satisfy the civil standard. In other words, in proving the requisite elements of the criminal definition, the elements of the civil definition necessarily are satisfied.

It is clear from the record that the court credited the plaintiff's testimony that the defendant had surveilled her and her child, perhaps surreptitiously, in order to ascertain the location of the plaintiff's new home and the child's new bus stop, despite the plaintiff's having

told the defendant to leave the child alone. The court also credited the testimony of the plaintiff and Howard that the defendant stood across the street from the bus stop, two to three times a week, in order to see and attempt to interact with the child, who did not want the same with the defendant. The evidence also shows the defendant's surreptitious attempts to gather information from the plaintiff's mother about the child's travels to school. We see little difference between the defendant's actions of surveilling the child from near the plaintiff's home and the defendant's actions in *Princess Q. H.* of repeatedly driving past the plaintiff's home. Consequently, we conclude that the defendant's actions, as specifically found by the trial court, constituted stalking as that term is commonly defined and applied.

In light of the foregoing, including the court's findings and the breadth afforded the definition of stalking espoused in *Princess Q. H.*, we cannot conclude that the court erred when it continued the restraining order against the defendant as it pertains to the child.

## II

The defendant also claims that the court erroneously based its decision on testimony that the plaintiff gave on behalf of the child. The defendant's claim is evidentiary in nature and, because he did not properly preserve his objection at the hearing, we decline to review it. Furthermore, in light of the other evidence submitted to the trial court, without objection, the court's admission of the limited testimony to which the plaintiff did object, even if in error, was harmless.

Our Supreme Court has held that "[o]ur rules of practice make it clear that when an objection to evidence is made, a succinct statement of the grounds forming the basis for the objection must be made in such form as counsel desires it to be preserved and included in the record. . . . This court reviews rulings solely on the ground on which the party's objection is based. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the *precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling*. . . . The purpose of such a requirement is apparent since we have consistently stated that we will not consider . . . evidentiary rulings . . . where no claim of error was preserved for review on appeal by proper objection and exception. . . . Moreover, once the authority and the ground for an objection is stated, our review of the trial court's ruling is limited to the ground asserted." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Braman*, 191 Conn. 670, 684–85, 469 A.2d 760 (1983).

Additionally, if there were an erroneous evidentiary

ruling, "[b]efore a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Iino* v. *Spalter*, 192 Conn. App. 421, 431, 218 A.3d 152 (2019).

The following additional facts are relevant to our review. Early in the plaintiff's testimony, while testifying that her child fears that the defendant will take him away, the defendant's counsel objected, stating, "how does she know—if the son has fears; doesn't the son have to say he has some type of fear?" Counsel further argued that the defendant did not "want his grandson to be quoted without any way of verifying it." Following the objection, the court stated that if the defendant wanted the child brought to court to testify, the court would arrange to do so. The defendant declined the court's invitation. The court then overruled the defendant's objection. The plaintiff resumed her testimony without any further objections by the defendant specific to this claim, during direct examination and cross-examination. Consequently, as previously noted, the plaintiff testified, without objection, that her child told her that he did not want the defendant at his bus stop, that her mother told her that the child closed the shades because he is afraid of the defendant, that the child's friend told the plaintiff that her child was afraid that the defendant would take him away, that the child was upset that the defendant showed up at his Cub Scout meeting, and that the defendant's actions were affecting the child's schoolwork and behavior. The defendant also did not object to the admission of exhibit 4, in which the plaintiff also described the negative effects that the defendant's conduct was having on the child. Additionally, the defendant did not object to Howard's testimony regarding the child's efforts to avoid interacting with the defendant at the bus stop. Furthermore, during oral argument before this court, the defendant's counsel conceded that he did not object to the plaintiff's testimony beyond his initial objection.

The defendant's objection, and subsequent argument in support of that objection, is not a model of clarity— he did not state the precise nature of his objection. Although, in support of this claim, the defendant's appellate brief sets forth several arguments sounding in hearsay, the defendant did not object to the testimony of the plaintiff on hearsay grounds and, therefore, makes this argument for the first time on appeal. The question of whether the limited testimony of the plaintiff to which the defendant objected constituted hearsay is not a matter properly before this court because "to review [a] defendant's [hearsay] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of

the trial judge. . . . We . . . do not address the merits of [such a claim]." (Citation omitted; internal quotation marks omitted.) *State* v. *Braman*, supra, 191 Conn. 685.

Furthermore, as noted, the court had before it substantial evidence, to which the defendant did not object, that separately established that the child fears the defendant. Thus, even if the court erred in overruling the defendant's objection to the plaintiff's testimony that her child told her that he fears the defendant, any such error was harmless. See *Iino* v. *Spalter*, supra, 192 Conn. App. 438–44 (any error in admitting testimony was harmless where defendant did not object to similar testimony).

Accordingly, because the defendant did not state the specific reason for his objection to the plaintiff's testimony, we conclude that his claim is unpreserved and, thus, unreviewable. We further conclude that any error was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained.

[1] General Statutes § 46b-15 provides in relevant part: "Any family or household member . . . who has been subjected to a continuous threat of present physical pain or physical injury, stalking or a pattern of threatening . . . by another family or household member may make an application to the Superior Court for relief under this section. . . ."

[2] The plaintiff did not file a brief in this appeal. We, therefore, decide the appeal on the basis of the defendant's brief and the record. See *Murphy* v. *Murphy*, 181 Conn. App. 716, 721 n.6, 188 A.3d 144 (2018).

[3] "Find My iPhone" is a preinstalled smart phone application that utilizes cell phone tower and satellite technology to track the location of a particular iPhone when that phone is powered on. See *A. A. C.* v. *Miller-Pomlee*, 296 Or. App. 816, 820 n.2, 440 P.3d 106 (2019); see also *Jones* v. *United States*, 168 A.3d 703, 735 (D.C. App. 2017) (Thompson, J., dissenting) ("case law is replete with references to iPhone owners . . . locating . . . iPhones by using the Find My iPhone app").

[4] General Statutes § 53a-181d provides in relevant part: "(a) For the purposes of this section, 'course of conduct' means two or more acts, including, but not limited to, acts in which a person directly, indirectly or through a third party, by any action, method, device or means, including, but not limited to, electronic or social media, (1) follows, lies in wait for, monitors, observes, surveils, threatens, harasses, communicates with or sends unwanted gifts to, a person, or (2) interferes with a person's property, and 'emotional distress' means significant mental or psychological suffering or distress that may or may not require medical or other professional treatment or counseling.

"(b) A person is guilty of stalking in the second degree when:

"(1) Such person knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to (A) fear for such person's physical safety or the physical safety of a third person, or (B) suffer emotional distress . . . ."